**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3366-17T1

89 WATER STREET
ASSOCIATES, Limited
Liability Company,

      Plaintiff-Appellant,

v.

JOHN H. REILLY, III,
Personal Representative
of the Estate of JOHN H.
REILLY JR. and MARGARET
REILLY,

      Defendants-Respondents.

_____

        Argued telephonically April 5, 2019 – Decided October 1, 2019

        Before Judges Rothstadt, Gilson and Natali.

        On appeal from the Superior Court of New Jersey, Chancery Division, Cumberland County, Docket No. C-000003-15.

        William G. Wright argued the cause for appellant (Capehart & Scatchard, PA, attorneys; William G. Wright, on the briefs).

Hugh J. Hutchison (Leonard, Sciolla, Hutchison, Leonard & Tinari) of the Pennsylvania bar, admitted pro hac vice, argued the cause for respondents (Leonard, Sciolla, Hutchison, Leonard & Tinari, LLP, and Hugh J. Hutchison, attorneys; Keith N. Leonard and Hugh J. Hutchison, on the brief).

The opinion of the court was delivered by

ROTHSTADT, J.A.D.

In 2004, plaintiff 89 Water Street Associates, LLC entered into contract to purchase industrial property in Bridgeton from defendant John H. Reilly III's father, the late John H. Reilly, Jr., and the decedent's wife, defendant Margaret Reilly. Plaintiff appeals from the Chancery Division's January 10, 2018 judgment and from the denial of its motions for reconsideration and clarification. On appeal, plaintiff contends that the trial judge erred by making plaintiff's contractual right to purchase conditioned upon its assumption of certain environmental obligations that were originally imposed on defendants by the parties' contract. For the reasons that follow, we reverse the final judgment and remand for further proceedings because the evidence did not support the judge's findings and her legal conclusions were incorrect.

I.

The origin of the parties' dispute related to the environmental condition of the subject industrial property. At the time the parties entered into the

contract, the elder Reillys were its sole owners.[1]  Approximately twenty years earlier, the Reillys purchased the property, obtained a No Further Action Letter (NFAL) from the New Jersey Department of Environmental Protection (NJDEP),[2] under the New Jersey Industrial Site Recovery Act (ISRA), N.J.S.A. 13:1K-6 to 13:1K-14, and leased the property in 1984 to National Refrigerants, Inc. (NRI), an "independent worldwide distributor of refrigerants" and provider of "associated refrigerant management service."  John H. Reilly, Jr. was NRI's sole shareholder.

The parties entered into the contract for sale of the property on October 29, 2004.  The pertinent provisions are summarized as follows.  The agreed upon purchase price was $475,000.  Section 5 of the contract required the closing to take place on August 15, 2005, "provided the conditions set forth in this Agreement have been satisfied or waived by that time."  However, if all of the conditions in the agreement were not satisfied by August 15, 2005, the closing date would be

_____

[1]  In 2006, Margaret Reilly conveyed her interest in the property to her husband.

[2]  As discussed in more detail below, under ISRA, the NFAL was a determination by the NJDEP that "there are no discharged hazardous substances or hazardous wastes present at the site of the industrial establishment . . . and that . . . any hazardous wastes present at the industrial establishment … have been remediated . . . ."  N.J.S.A. 13:1K-8 (2004).

extended for an additional period not to exceed six months or February 15, 2006. The agreement did not contain a time of the essence clause or language stating that failure to close by August 15, 2005 or February 15, 2006 would be grounds for defendants to cancel or terminate the agreement.

In Section 18, subsection (a), plaintiff "acknowledge[d] that [defendants had] disclosed . . . prior environmental assessments[,] . . . studies[,] and test[ing of the property that NRI had obtained, which] revealed certain environmental conditions . . . requir[ing] further investigation and[, as the provision stated,] that could have required the Property be remediated and/or cleaned-up." The disclosed materials included an April 1993 NFAL regarding "groundwater contamination discovered in 1989."

In Section 18, subsection (b), the contract imposed an obligation to obtain from the NJDEP confirmation that the property was properly remediated under existing or future environmental laws or regulations. It stated that "the parties acknowledge[ed] that [ISRA], the regulations promulgated thereunder[,] and any amending or successor legislation and regulations" applied to the transaction. It also provided that as a condition precedent to plaintiff's obligations under the agreement, defendants must "receive[] from the Industrial Site Evaluation Element [(ISEE)] or its successor . . . a Clearance Document by the Closing Date." The

4

Clearance Document was to be "(i) a non-applicability letter; (ii) a de minimus quantity exemption; (iii) an unconditional approval of [defendants'] negative declaration from the" ISEE or its successor; "or (iv) some other document from the [NJ]DEP indicating that no further action is required with respect to any environmental remediation of conditions on the Property."

Section 18, subsection (c) provided that "if [defendants are] unable to obtain such a Clearance Document by the Closing Date, then [plaintiff] shall have the right to cancel this agreement by written notice to [defendants] or to purchase the Property subject to the completion of the ISRA process . . . ." However, Subsection (d) stated that plaintiff could not exercise the option to cancel under subsection (c) "if [defendants] continue [their] diligent efforts with the [NJ]DEP seeking a Clearance Document, and ha[ve] taken all reasonable and necessary actions required of" them. Ibid. And, it provided that "[t]he parties agree that so long as [defendants] cooperate[] with the [NJ]DEP in good faith in pursuing a Clearance Document, no party may exercise any right to terminate this Agreement . . . until there has been a final decision with respect to the issuance of a Clearance Document." The contract did not impose any time limit for defendants to secure required documents nor did it place a cap on the amount of costs that they would have to incur in order to secure the clearances from the NJDEP.

A-3366-17T1

Finally, Section 23 provided for the payment of attorney's fees to the prevailing party in any action to enforce the agreement. It defined "prevailing party" as a "party who substantially attains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense."

The environmental conditions disclosed by defendants to plaintiff were revealed through various documents related to NRI's efforts to comply with ISRA that began prior to 2004 and continued after the parties signed their contract. During those years, NRI made various required submissions to the NJDEP and received back notices of deficiencies that had to be corrected.

In the years prior to December 2012, when NRI was pursuing approval from the NJDEP, NRI's and defendants' counsel was in contact with plaintiff's attorney about NRI's efforts and the NJDEP's responses. Those communications continued for years after July 21, 2005, when plaintiff advised defendants that it was exercising its right under the contract to extend the closing date by six months from August 15, 2005, and requested a report on the "status of the efforts[] and progress[] made related to securing [the] environmental 'Clearance Documents, which he later received.'" From 2005 through 2010, neither party took any action to terminate their agreement or demand that closing occur.

In 2010, the NJDEP advised NRI of the newly enacted Site Remediation Reform Act (SRRA) that replaced ISRA and recommended that NRI engage a licensed site remediation professional (LSRP), as required by the new Act. In response, NRI hired an LSRP and continued to pursue obtaining a Clearance Document through 2017, which under the SRRA, was a Response Action Outcome (RAO) report.

Beginning in April 2010 through 2011, plaintiff wrote to defendants suggesting that they close title with the condition that defendants and NRI "complete the remediation at [their] cost after closing." In response, defendants' attorney advised that his clients "remain[ed] unwilling to close ... until all required environmental clearances have been issued and there is no further liability on [defendants]."

In November 2012,[3] defendants updated plaintiff on the NJDEP's latest requirements as determined by NRI's environmental consultant. They advised that at that point, the LSRP had not provided the estimated cost of the work needed to secure a RAO.[4]

---

[3] John H. Reilly, Jr. passed away on May 1, 2012.

[4] In December 2016, defendants' LSRP issued a "Remedial Investigation Report/Remedial Action Work Plan" and in February 2017 sent it to NJDEP.
(continued)

A-3366-17T1

On December 21, 2012, defendants attempted to cancel the contract. In a letter from their attorney, defendants notified plaintiff that "the [c]ontract has terminated without default by any party" because the environmental condition precedent was not satisfied within the specified time period. Defendants' notice also stated that there would be "no further obligations on the part of either party," and that plaintiff would be refunded its deposit.[5]

Plaintiff's counsel replied on January 8, 2013, stating that plaintiff relied on defendants' good faith in connection with remediation of the environmental conditions, that it "wishe[d] to proceed with the purchase of the property," and that it believed the "[c]ontract [was] still in force." Counsel requested the status of the environmental cleanup and concluded that plaintiff "ha[d] waited in good faith for [defendants] to complete [their] obligations and the failure of [defendants] to [do so] does not . . . suffice as a self-serving basis to void the contract." Counsel considered the contract to be fully enforceable, stating that he took "issue with any

---

(continued)
The record does not contain any further information about the status of NRI's efforts.

[5] After unsuccessful attempts to return the deposit, plaintiff's counsel deposited the funds into his trust account.

assertion that the [c]ontract may be rescinded as a result of [defendants'] lack of good faith in connection with the environmental remediation."

On March 6, 2015, plaintiff filed its complaint seeking declaratory judgment that "The Contract of Sale [Had] Not Terminated," and that it was "Not Obligated to Close Until Defendants Obtained The Clearance Documents." Plaintiff also sought specific performance, alleged breach of contract, breach of the implied covenant of good faith and fair dealing, and argued that defendants were equitably estopped from terminating the contract.

Defendants filed an answer and counterclaim, in which they contended that the contract expired "by its own terms . . . as of February 16, 2006," that "[p]laintiff never sought an[] extension of that deadline," and that plaintiff did not deliver payment in full for the property. Defendants alleged that because the contract provided for an environmental assessment to be supplied by plaintiff within six months of the contract date, plaintiff "waived [all] environmental conditions . . . relating to the Property," in accordance with Section 18(e) of the contract.[6] Defendants sought declaratory judgment that "[p]laintiff waived all

---

[6] Section 18(e) of the contract states the buyer "may cause an environmental assessment at a level commonly known as a Phase I Environmental Assessment/Audit to be done on the Property." If plaintiff acted on this option, it would have been required to "present [defendants] with a copy of the

(continued)

environmental conditions relating to the property"; that "[p]laintiff never [requested] to extend the time by which the parties were required to close on [the] sale and purchase," and as such, "the [c]ontract terminated by its own terms"; and it requested an order directing "the escrow agent to release the deposit funds."

The matter was tried without a jury on October 5, 2017. At trial, the parties stipulated to certain facts and the admission into evidence of relevant documents before calling any witnesses. Plaintiff's sole member Brent Hankins and an attorney, Theodore E. Baker, testified for plaintiff. Baker had represented plaintiff in the negotiation of the contract and its subsequent dealings with defendants. Plaintiff also read into the record deposition testimony of Keith Leonard and Stephen Labroli, who were both attorneys for the Reillys. The portions of Leonard's deposition read into the record described the type of representation he and Labroli provided to defendants, and the continued efforts defendants made up until trial to acquire the Clearance Documents, and that the contract between the

---

(continued)
Report within (6) months of the effective date of [the] Agreement. If [plaintiff did] not do so within that period of time, [plaintiff was] deemed to have approved or waived any environmental conditions at, on, under or otherwise arising out of or relating to the Property." If the Report indicated the "likelihood of or the presence of hazardous substances, materials or wastes," plaintiff ha[d] five days to notify defendants if it "elect[ed] to terminate [the] Agreement." Since plaintiff never conducted its own assessment, Section 18(e) was inapplicable.

parties lacked any language indicating time was of the essence. Labroli's testimony related to the parties' lack of any communications indicating the contract would be cancelled if closing did not occur by February 15, 2006.[7]

Defendants' representative, Carmen Carosella, an officer and representative of NRI, was the only witness who testified for defendants. Notably, defendants did not call any experts to testify as to remediation and its historical or anticipated costs.

Carosella testified that he negotiated the terms of the contract for the elder Reillys in 2004. He explained that NRI had spent "in the area of $360 to $400,000" toward its efforts to obtain NJDEP clearance. He stated that "[w]e had no anticipation of incurring these kinds of costs . . . to get a final [NFAL]." He testified that according to defendants' LSRP, additional expenses were estimated by another $350,000. However, on cross-examination, Carosella clarified that defendants did not pay any of the expenses as they were all paid by NRI, which did not seek any reimbursement from defendants, and that there was no agreement with NRI that required defendants to do so. To the contrary, he confirmed NRI

---

[7] Most of the deposition testimony plaintiff planned to read was sustained on objection.

was obligated under its lease with defendants to pay all of the expenses related to obtaining the Clearance Document.[8]

In the January 10, 2018 written decision, the trial judge set forth her findings of fact and conclusions of law. Relying on two letters admitted as joint exhibits, the judge made initial findings about the parties' intent at the time they entered into the contract. The judge stated the following:

> At the time of execution of the contract, buyer and seller believed that obtaining a [C]learance [D]ocument would not require significant time or, cost [J-43, J-18, J-19]. This belief was reasonable because seller had received a [NFAL] from [NJ]DEP prior to purchasing the [property] and because the business operation of the tenant, NRI, did not pollute the [property].
>
> The contract reflects the parties' belief that obtaining a clearance document would be an administrative formality. The contract does not include a dollar limitation to protect seller from a substantial reanimation expenditure. The contract at paragraph 18 (c) allows buyer to take title and assume the responsibility of obtaining a [C]learance [D]ocument at buyer's cost. Buyer and seller are sophisticated parties and each believed that [NJ]DEP would issue a [C]learance [D]ocument in a relatively short time. [J-18, J-19].

---

[8] On direct examination, Carosella confirmed that the securing of an RAO was NRI's responsibility and had to be obtained regardless if the property was sold to plaintiff.

However, the judge concluded that defendants' December 2012 attempt to cancel the contract under Section 5 of the contract was not effective. According to the judge, once the closing date addressed in Section 5 passed, defendants "did not have the right to cancel the contract pursuant to [Section] 5" because defendants "continued to work in good faith with [NJ]DEP to obtain a [C]learance [D]ocument, [making Section] 18 (d) . . . applicable." The judge concluded, under that section, neither party could "terminate . . . until there ha[d] been a final decision on the issuance of the [C]learance [D]ocument."

The judge then explained that after the NJDEP chose not to review defendants' ISRA submissions, because of the implementation of the SRRA's procedures, defendants "could no longer work in good faith with [NJ]DEP to obtain a final decision." At that point, under Section 18(c), plaintiff could either "cancel the contract or proceed" with the closing without the Clearance Documents and assume responsibility for the remediation, but receive financing through defendants. According to the judge, plaintiff's right to cancel under Section 18(c) was "limited by [Section] 18 (d) which obligate[d plaintiff] to perform if [defendants] . . . continue[d] to work with [NJ]DEP to obtain a [C]learance [D]ocument."

However, the judge acknowledged that under the SRRA a Clearance Document could still be obtained in the form of a RAO, but found it was "not one of the four [C]learance [D]ocuments issued by [ISEE] of [NJ]DEP and described in [Section] 18 (b)." Once defendants could no longer work with NJDEP because of the SRRA's procedures, Section "18 (d) no longer tolled the time for [plaintiff's] election to cancel or close as stipulated in [Section] 18 (c)."

Moreover, the judge concluded that because the cost of obtaining an RAO was not "contemplated" by the parties and "[t]he cost exceed[ed] the contract purchase price," defendants should not be responsible for obtaining the RAO. Relying on the Court's opinion in Dixon Venture v. Joseph Dixon Crucible Co., 122 N.J. 228, 233 (1991), and quoting from our opinion in Feighner v. Sauter, 259 N.J. Super. 583, 593 (App. Div. 1992), the judge stated that "[w]hen a contract . . . is silent as to how much the seller is obligated to spend to comply . . . , by implication the seller is obligated to spend a reasonable sum in relation to the selling price."

The judge summed up her explanation by stating the following:

> Given the length of time defendants have pursued the [C]learance [D]ocument, [NJ]DEP's failure to make a decision, the passage and implementation of the LSRP procedure established by the SRRA, the cost/time of the LSRP process, [plaintiff]'s continued interest in purchasing the [property], and the language of

14

> [Section] 18 (c), the contract will be specifically enforced to allow [plaintiff] either to cancel the contract or proceed to closing and assume the cost of obtaining an RAO.

The judge rejected plaintiff's arguments that equitable estoppel or defendants' alleged breach of the covenant of good faith barred defendants from being granted any relief from their obligations because there was no evidence that defendants acted "deceitfully," made any "misrepresentations," and their "inability to obtain a [C]learance [D]ocument was caused by [NJ]DEP."

The judge also found that defendants were not entitled to be excused from performance, as modified by her decision, based on "the defenses of impossibility or frustration of purpose." According to the judge, "the mutual purpose of the contract [was] not frustrated" by the parties understanding of the change in cost of obtaining clearances because "[t]he sale [could still] be completed with [plaintiff] assuming the cost." The judge dismissed plaintiff's affirmative claims with prejudice and neither party was deemed the "prevailing party within the meaning of the contract," as it related to an award of attorneys' fees.

The judge memorialized her decision in the January 10, 2018 judgment under appeal. Although the judgment provided that if plaintiff chose "to proceed with the purchase of the property," it waived defendants' "further obligation to obtain an RAO," and it also provided for a later "adjust[ment of] the cost of

15

obtaining the RAO between [the parties] given the unique circumstances of the case." For that reason, the judge retained jurisdiction over the matter.

Plaintiff filed a motion for reconsideration. In its motion, plaintiff argued that it did not have an opportunity to address the judge's conclusion that the substitution of SRRA for ISRA was an altering event that warranted defendants being relieved of their obligation to obtain a Clearance Document because the issue was not raised by defendants at trial. Plaintiff further argued that the judge wrongfully determined it was not entitled to attorney's fees even though it prevailed on its claim that the contract was not terminated.

Plaintiff also filed a motion for clarification, asking the judge to confirm that while her decision imposed on plaintiff the obligation to obtain the environmental clearance as between the parties, it did not impact the question of whether NRI as a tenant had a legal obligation to remediate the property and obtain the clearance.

The judge denied both of plaintiff's motions on March 16, 2018, in an oral decision placed on the record. In her decision, the judge stated that she relied upon the parties expectation in 2004 that the transaction would amount to a quick sale and that the associated cost of obtaining the Clearance Document by 2012 far exceeded the parties expectations. According to the judge, because plaintiff became the equitable owner of the property upon entering into the contract, it was

fair to impose the unexpected costs of obtaining the Clearance Document. As to the clarification motion, the judge denied relief because NRI was not a party to the action. Finally, as to attorney's fees, the judge reiterated that neither party prevailed.

In reaching her decision, the judge stated:

> You know, in truth, neither party thought there was going to be this kind of expenditure. But once the LSRP process kicks in, it becomes a very expensive proposition. I don't have the details on the numbers, I just know that this transaction becomes a very difficult one for the seller as a result of the LSRP's recommendations, the cost of even doing the analysis, let alone any future remediation, so that, buyer's kind of in a gotcha position where they're saying, well, look, there's no cap on the environmental responsibility of the sellers set forth in the document. And that's consistent with both party's intent, that this is going to be a relatively quick sale, an easy get for an [NFAL], and so much so that the buyer is willing to take on the cost of same if the seller can't do it.
>
> You know, it's 200[4] I think they signed the contract. And by 2012 sellers frustrated and sends a cancellation letter. Well, when you looked at the contract, and that's what I tried to do, I looked at the contract, I said what I said about it. I didn't see in there the right for the seller to cancel it.

This appeal followed.

II.

On appeal, plaintiff argues that the trial judge erred by relieving defendants of their contractual obligation to obtain the Clearance Document and imposing it on plaintiff, if plaintiff chose to proceed to closing, and by "retain[ing] jurisdiction to adjust the cost of obtaining the RAO between" the parties. It also contends that the judge should have awarded it attorney's fees as the prevailing party under the contract. Plaintiff further challenges the denial of its reconsideration motion.

Our review of a trial judge's factual determinations in a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "[W]e do not disturb the factual findings . . . of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice[.]" Ibid. (second alteration in the original) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Such findings "are binding on appeal when supported by adequate, substantial, credible evidence." Ibid. (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).

Issues of law, however, are reviewed de novo, and we will not defer to a trial court's conclusions of law or the legal consequences that flow from established facts. Cherokee LCP Land, LLC v. City of Linden Planning Bd., 234 N.J. 403,

A-3366-17T1

414-15 (2018). Specifically, "[w]hen a trial [judge's] decision turns on its construction of a contract, appellate review of that determination is de novo." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014).

III.

Applying that standard, we conclude the trial judge misinterpreted the contract and that the evidence did not support her findings about the expectations of the parties. Moreover, we find inapposite the judge's reliance upon Feighner and Dixon as support for her decision that defendants should be relieved of their responsibility to obtain the Clearance Document.

A.

We begin by acknowledging the limitations on a court's power to alter written agreements. "Contracts, should be read 'as a whole in a fair and common sense manner.'" Manahawkin Convalescent, 217 N.J. at 118 (quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009)). Courts generally give contractual terms their plain and ordinary meaning. Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002) (quoting Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997)). "A party that uses unambiguous terms in a contract cannot be relieved from the language simply because it had a secret,

unexpressed intent that the language should have an interpretation contrary to the words' plain meaning." Ibid.

A contract "should not be interpreted to render one of its terms meaningless." Cumberland Cty. Improvement Auth. v. GSP Recycling Co., 358 N.J. Super. 484, 497 (App. Div. 2003). Similarly, courts should construe the provisions of a contract so that its terms do not conflict. Silverstein v. Dohoney, 32 N.J. Super. 357, 364 (App. Div. 1954). If such conflict is unavoidable, "the more specific provision . . . usually controls over the more general." Burley v. Prudential Ins. Co., 251 N.J. Super. 493, 500 (App. Div. 1991). Likewise, "[a] subsidiary provision is not . . . to be interpreted . . . to conflict with the obvious 'dominant' or 'principal' purpose of the contract." Newark Publishers' Ass'n v. Newark Typographical Union, 22 N.J. 419, 426 (1956).

Applying these guiding principles to the undisputed facts in this case, we find no support for the trial judge's conclusion that Section 18(b) of the contract contemplated defendants only being obligated to secure a Clearance Document under ISRA and not under SRRA as a superseding law, or that they anticipated the transaction, including securing the Clearance Document, would be quick or inexpensive. First, Section 18(b) of the contract stated that not only ISRA, but "any amending or successor legislation and regulations [were] applicable to the"

sale of the property. The SRRA therefore governed the sale after its adoption, and pursuant to the SRRA, the contract provided for defendants to pay the cost of the RAO report. The Section also stated that a Clearance Document includes "some other document from [NJ]DEP indicating that no further action is required with respect to any environmental remediation of or conditions on the Property." An RAO satisfies that definition.

The SRRA "changed the mechanism for remediation projects by placing the bulk of oversight duties in the hands of [LSRPs] and retaining only minimal oversight responsibilities for [NJ]DEP." Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 400 (2014) (footnote omitted). "The former resolution of a spill cleanup—the NJDEP's issuance of a [NFAL]—has been replaced by the rendering of findings by an LSRP who, upon finding a site to be clean so advises the NJDEP, which may thereafter conduct its own confirmatory examination." Matejek v. Watson, 449 N.J. Super. 179, 182 (App. Div. 2017). The LSRP's findings are embodied in a RAO report, which the LSRP provides "to the person responsible for remediation" and files with NJDEP when "the site has been remediated." N.J.S.A. 58:10C-14(d).

The SRRA adopted and incorporated into ISRA, identical definitions of a RAO letter as

a written determination by a [LSRP] that the contaminated site was remediated in accordance with all applicable statutes and regulations, and based upon an evaluation of the historical use of the site, or of any area of concern at that site, as applicable, and any other investigation or action [NJDEP] deems necessary, there are no contaminants present at the site, or at any area of concern, at any other site to which a discharge originating at the site has migrated, or that any contaminants present at the site or that have migrated from the site have been remediated in accordance with applicable remediation regulations, and all applicable permits and authorizations have been obtained.

[N.J.S.A. 58:10C-2; accord N.J.S.A. 13:1K-8.[9]]

---

[9] At the time the parties executed the contract, ISRA defined a NFAL as:

a written determination by the [NJDEP] that, based upon an evaluation of the historical use of the industrial establishment and the [site], or of an area of concern or areas of concern, as applicable, and any other investigation or action the department deems necessary, there are no discharged hazardous substances or hazardous wastes present at the site of the industrial establishment, at the area of concern or areas of concern, or at any other site to which discharged hazardous substances or hazardous wastes originating at the industrial establishment have migrated, and that any discharged hazardous substances or hazardous wastes present at the industrial establishment or that have migrated from the site have been remediated in accordance with applicable remediation regulations.

[N.J.S.A. 13:1K-8 (2004).]

A RAO report serves similar purposes as a NFAL under ISRA, N.J.S.A. 13:1K-9(b)(2) and 9(d)(2), and under other statutes affected by SRRA. N.J.S.A. 58:10-23.11g(e); N.J.S.A. 58:10B-11(a); N.J.S.A. 58:10B-13.1 to 13.2. The SRRA amendments treat both an NFAL and an RAO as a "Final remediation document." N.J.S.A. 58:10-23.11b; accord N.J.S.A. 58:10B-1. Therefore, the trial judge's conclusion that an RAO report does not fit the definition in Section 18(b) was incorrect.

Second, as the trial judge correctly observed, the contract did not contain any limitation on the cost to be incurred by defendants in performing their obligation. If these "sophisticated" business parties wished to impose a limitation, the contract reveals that they were aware that a limitation could be imposed. For example, in Section 14 of the agreement, the parties imposed a limitation on defendants' responsibility for repairing damage to the property caused by wood destroying insects. There was no evidence at trial that indicated the parties contemplated any limitation on the costs defendants were to incur for the environmental remediation or that the parties intended to shift the burden of those costs to plaintiffs.

As to those remediation costs, defendants, not plaintiff, were at the time of the contract, and for years thereafter, involved in NRI's efforts to obtain

environmental clearances. They were in the best position to assess NRI's expenditures before the parties entered into the contract. The fact that the costs were more than anticipated or the process was taking longer than they hoped did not warrant relief from their obligations under the contract. Neither the delay nor the costs warranted relieving defendants of their obligations under the doctrines of impossibility or frustration. As to those doctrines, we recently observed the following:

> Indeed, "[b]oth the impossibility and frustration doctrines are concerned with '[a]n extraordinary circumstance [that] may make performance [of a contract] so vitally different from what was reasonably to be expected as to alter the essential nature of that performance.'" "The doctrines stem from the concept of an implied condition within a contract." "[T]he concept is that a contract is to be considered 'subject to the implied condition that the parties shall be excused in case, before breach, the state of things constituting the fundamental basis of the contract ceases to exist without default of either of the parties.'"

> Frustration of purpose arises when "the obligor's performance can still be carried out, but the supervening event fundamentally has changed the nature of the parties' overall bargain." "The frustration must be so severe that it is not fairly to be regarded as the risks that [the party invoking the doctrine] assumed under the contract." Relief from performance of contractual obligations on the theory of frustration of purpose "will not be lightly granted; the evidence must be clear, convincing[,] and

24

adequate." By comparison, under the related doctrine of impossibility or impracticability of performance, a party is excused from having to perform his contract obligations "where performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties."

[Capparelli v. Lopatin, 459 N.J. Super. 584, ___ (App. Div. 2019) (slip op. 22-23) (alterations in the original) (citations omitted).]

Defendants' conduct demonstrated that until December 2012 they were not concerned with the time or expenses NRI was spending to get the Clearance Document. In fact, in 2010, defendants refused to schedule a closing before having the Clearance Document in hand. It was not until after John H. Reilly, Jr. passed away in 2012 and the NJDEP issued its findings in December of that year that defendants took any action towards cancelling the agreement, which they did before being aware of the costs to complete the remediation.

Finally, the contract imposed the obligation to secure the Clearance Document on defendants. However, NRI was pursuing the required document and incurring the costs. Although there existed a commonality of ownership, NRI remained a separate entity. Courts generally "abide by 'the fundamental propositions that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from

25

the liabilities of the corporate enterprise.'"  Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc., 195 N.J. 457, 472 (2008) (quoting Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983)).  It would be an abuse of the corporate form to relieve a party to a contract of his or her responsibility to the other party because a company, in which the party is the sole shareholder, is incurring expenses pursuant to a lease with its shareholder that the shareholder is obligated to incur under his or her agreement with the other party.

Moreover, as already noted, the obligation assumed by defendants included complying with any "amending or successor [environmental] legislation" and required that it obtain certain documents under ISRA or "some other document from [NJ]DEP, indicating that no further action is required with respect to any environmental remediation of or conditions on the Property."  If defendants wanted to insulate themselves from the risk of obligations imposed by new legislation, the contract could have included a provision allowing for termination on that basis.  However, it did not and our function "is not to rewrite a contract for the parties better than or different from the one they wrote for themselves."  Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

B.

We also conclude the judge's reliance on <u>Feighner</u> or <u>Dixon</u> to relieve defendants from their obligation was mistaken. Both cases are distinguishable by the fact that there was no evidence in either case that the landowner was subject to the environmental laws and regulations that were later imposed after the contract, or that the landowner assumed responsibility for compliance in the agreement.

In <u>Feighner</u>, an industrial landowner entered into a contract to sell its property prior to the passage of a predecessor to ISRA, the Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 to -13. <u>Feighner</u>, 259 N.J. Super. at 586. After being notified by the NJDEP of the passage of ECRA and that its sale was subject to its provisions, the landowner obtained various estimates for the cost of remediation that exceeded more than ten percent of the property's sale price. <u>Id.</u> at 587. After the purchaser rejected the landowner's attempt to rescind the contract based on a claim that it could not comply with ECRA, litigation ensued between the parties. <u>Id.</u> at 588. In our opinion, we affirmed the trial judge's rejection of the landowner's attempt to rescind a contract for sale and the judge's ordering of specific performance to the purchaser, while capping the seller's obligation for clean-up costs at "less than 9% of the selling price." <u>Id.</u> at 594.

In Dixon, "the contract of sale nor the title-closing documents adverted in any way to the satisfaction of ECRA's requirements . . . ." 122 N.J. at 230-31. After the closing of title, the purchaser sought to recover cleanup costs when it was required to comply with ECRA. Id. at 231. Under those circumstances, the Supreme Court agreed with our determination that where the risk of compliance was not shifted to a purchaser, it should be able to maintain a cause of action to recover its costs as well as one for rescission because a "seller assumes the risks of cleanup and should not be able to avoid them by insistence on the rescission remedy," as the purchaser's only remedy. Id. at 234. However, the Court "remand[ed] the case to the trial court to fashion the remedy that best effectuates 'the common understanding' reached by the parties in light of the intervening ECRA requirements." Ibid. It did so because "the seller was not aware of its duties under ECRA, and thus was not aware that it was subject to liability for the cleanup," and "the buyer could not be held clearly liable either" because it "had agreed to purchase the property before the effective date of the Act, but the closing occurred after the effective date." Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 511 (1992).

Those cases both involved situations where the parties' original agreements did not contemplate compliance with existing environmental laws. Id. at 230;

Perini, 129 N.J. at 511. The facts in the case before us are different. Here, before the parties entered into the contract, NRI was already pursuing compliance with ISRA as required by its lease with defendants. The contract for sale disclosed those efforts and further acknowledged that ISRA was applicable to their transaction. Despite that knowledge, the parties did not shift the burden of compliance to plaintiff or impose any limits on the cost defendants were going to incur. And, again, significantly, defendants' tenant, not defendants, was incurring those costs. As the Dixon Court stated, a contract "that . . . reflect[ed] that the parties made the market choices and took the economic risks with knowledge of the [environmental] requirements," should be enforced. Dixon, 122 N.J. at 234. The parties' transaction here reflected that choice and defendants assumed all such risks.

## C.

Finally, we find no evidentiary support for the trial judge's conclusion that the cost of obtaining the Clearance Documents was unexpected or that they would be obtained quickly. As already noted, there was no expert testimony about the work or its costs and other than Carosella's unsupported statement about the parties' understanding in 2004, there was no direct evidence of their intentions. Even the trial judge acknowledged that although she believed "once the LSRP

29

process kicks in, it becomes a very expensive proposition," she did not "have the details on the numbers."

As to the parties' expectations about the time it would take to secure the Clearance Documents, in her decision, the judge citied to two letters exchanged between the parties' attorneys in 2007, three years after they entered into the contract. The first letter sent by plaintiff's counsel acknowledged receipt of a "Notice of Deficiency" from the NJDEP,[10] which counsel found to be "neither monumental nor substantial in nature." Counsel understood that the requirements set forth in the notice would delay the issuing of a NFAL for "nine to twelve months," but assured defendants' attorney that plaintiff was committed to going forward. In response, defendants' attorney wrote the second letter, which stated that the NJDEP notice was "unexpected," but that "many of the issues [raised in it] can be resolved quickly," and that defendants "appreciated [plaintiff's] commitment." Neither letter related to the parties' understanding or expectation about how long the process would take or the extent of the costs associated with complying with the contract's obligations. In fact, none of the documents stipulated to or otherwise admitted that were exchanged between the parties,

---

[10] The NJDEP's December 1, 2006 notice is the third document referred to by the judge as supporting his conclusion.

referred in any way to the parties having an initial expectation that the matter would be closed quickly or limited to any anticipated cost. The parties' subsequent conduct was consistent with moving forward with the matter as originally contemplated until December 2012, when defendant attempted to cancel the agreement.

IV.

In light of our determination that the parties agreement should have been enforced without modification, there can be no question that plaintiff was a "prevailing party" under the agreement entitled to legal fees as contemplated by the parties. For that reason, on remand, the trial judge must award attorney's fees consistent with the parties' agreement and Rule 4:42-9.

Since we conclude plaintiff was entitled to relief for the reasons already stated, we need not address any of its remaining arguments.

Reversed and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3366-17T1